## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANNY WESTON, SANDRA WESTON, MARY YOUNG, DANIEL YOUNG, TONI BUCHETTO PERRETTA, CHERYL BOUCHER, DAVID BOUCHER, MARTIN GREENWALD, MARGARET GREENWALD, ALICE REH, KATHLEEN SEARS, DAVID DIAN, SUSHMA NARULA, and KATHERINE SPAGNOLO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SUBARU OF AMERICA, INC. and SUBARU CORPORATION f/k/a FUJI HEAVY INDUSTRIES, LTD. <br><br> Defendants. | No. 1:20-cv-05876-RMB-JS <br><br> SECOND AMENDED CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiffs Danny Weston, Sandra Weston, Mary Young, Daniel Young, Toni Buchetto Perretta, Cheryl Boucher, David Boucher, Martin Greenwald, Margaret Greenwald, Alice Reh, Kathleen Sears, David Dian, Sushma Narula, and Katherine Spagnolo ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Subaru of America, Inc. ("SOA") and Subaru Corporation f/k/a Fuji Heavy Industries, Ltd. ("Subaru Corp.") (together, "Defendants" or "Subaru"). Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations:

**INTRODUCTION**

1.    Plaintiffs bring this consumer class action lawsuit because Defendants manufactured, marketed, distributed, and sold 2012-2020 Subaru Forester, 2015-2020 Subaru Legacy vehicles, and 2015-2020 Subaru Outback vehicles (the "Class Vehicles") without disclosing the existence of a troubling defect that jeopardizes the safety of Class Vehicle drivers, passengers, and other drivers and pedestrians.

2.    Beginning in 2011, if not before, Defendants knew that the Class Vehicles contain one or more defects that cause sudden and unintended acceleration without driver input ("Sudden Acceleration Defect" or "Defect"). The Defect causes the vehicle to accelerate without warning, often while the driver depresses the brake pedal. Upon information and belief, the Class Vehicles are defective in at least three primary respects. First, the Class Vehicles have an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including unintended acceleration. Such systems may consist of integrated mechanical and electronic devices that perform different functions and transfer signals between the vehicle's components or networks; algorithms may be programmed to process real-time data generated while driving and detect faults, or errors, among the vehicle's components or networks. Additionally, the Class Vehicles' throttle position sensor, throttle body assembly,  powertrain control module, hydraulic brake system and/or related components are highly susceptible to malfunction, including but not limited to circuit boards that are faulty due to defective design, manufacture and/or workmanship. Hydraulic brake systems work by transmitting the force from a driver's push on the brake pedal to the wheel brakes through pressurized fluid,

converting the fluid pressure into useful energy to brake the wheels. Specifically, when the driver pushes the brake pedal, that force is applied to the master-cylinder piston, which compresses the brake fluid. Meanwhile, the fluid pressure is equally transmitted throughout the fluid to the front and rear wheel cylinder pistons. Finally, the Class Vehicles' brake override system malfunctions due to defective design, manufacture, and/or workmanship or otherwise is ineffective to sufficiently override acceleration that the driver does not initiate and cannot control.

3.      Defendants failed to disclose these material facts and safety concerns to purchasers and lessees of the Class Vehicles.

4.      The Sudden Acceleration Defect has been documented to occur without warning during the operation of the Class Vehicles and poses an extreme and unreasonable safety hazard to drivers, passengers, and pedestrians. Numerous Class Vehicle owners have reported the same alarming experience: their Class Vehicles accelerate without warning as the drivers attempt to brake or slow their vehicles or while the driver's foot is on the brake pedal. Not surprisingly, many Class Vehicle owners have reported collisions or near-collisions due to the sudden and unexpected acceleration. For example, the sudden unintended acceleration led to the hospitalization of Plaintiffs Martin and Margaret Greenwald.

5.      Plaintiffs are informed and believe, and based thereon allege, that the Class Vehicles share the same brake mechanism and related componentry.

6.      One such complaint involving a 2017 Subaru Forester was reported to the National Highway Transportation Safety Authority ("NHTSA") as follows:

TL* The contact owns a 2017 subaru forester. While driving 5 mph, the brake pedal was depressed and the vehicle accelerated independently without warning. As a result, the vehicle crashed into a cement divider. The vehicle then lunged forward and crashed into a tree three times and a parked vehicle. The contact sustained head injuries that did not require medical attention. It was unknown if a police report was filed. The vehicle was towed to a tow lot and later towed to mckenna subaru (located at 1880 Beach Blvd, Huntington Beach, CA 92648, (888) 685-1421). The dealer was unable to locate a failure code. The vehicle was not repaired. The manufacturer was notified of the failure and provided case number: sr1-36575883866. The approximate failure mileage was 11,000.[1]

7.    Plaintiffs are informed and believe, and based thereon allege, that Defendants knew the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of sale or lease and thereafter. Defendants have failed to disclose the true nature and extent of the Sudden Acceleration Defect to Plaintiffs and the other Class Members, and actively concealed it from them, at the time of purchase or lease and thereafter. Had Plaintiffs and prospective Class Members known about the Sudden Acceleration Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

8.    Plaintiffs are informed and believe, and based thereon allege, that despite notice of the Sudden Acceleration Defect from, among other sources, pre-

---

[1]https://www.nhtsa.gov/vehicle/2017/SUBARU/FORESTER/SUV/AWD#complaints401 (last accessed May 5, 2020).

production testing, numerous consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the Defect, have not offered its customers a suitable repair or replacement free of charge, and have not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the Sudden Acceleration Defect.

9.    In fact, Subaru knew of and concealed the Sudden Acceleration Defect that plagues every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and the other Class Members both at the time of sale and repair and thereafter. As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

10.    Even more troublingly, Subaru conducts its own inspections of Class Vehicles when owners report collisions due to the Sudden Acceleration Defect. Subaru not only refuses to provide the full inspection reports to the vehicle owners, but it also does not take any measures to prevent these vehicles from being re-sold to unsuspecting consumers. Owners or lessees who experienced the Defect are often forced to trade in or sell their Class Vehicles because they are afraid to drive them, but cannot afford to simply purchase another vehicle without selling their defective Class Vehicles.

11.    On information and belief, in an effort to conceal the Sudden Acceleration Defect, Subaru has instructed dealers to tell consumers that their vehicles are "operating normally" or that "no issues could be found" in response to

5

complaints regarding the Defect. Moreover, dealers also shift blame to the vehicle operators by telling them that the vehicle's floor mats may cause the unintended acceleration, often even when the mats are properly secured and in place. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty.

## JURISDICTION AND VENUE

12.    This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs and many members of the Class are citizens of states different from Defendants' home state, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

13.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because SOA has its principal place of business and headquarters in this District; Subaru conducts substantial business in this District through SOA; and upon information and belief, significant conduct involving Defendants giving rise to the Complaint took place in this District.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, SOA has its principal place of business and regularly conducts

business in this District, and SOA is a resident of this District under 28 U.S.C. § 1391(c)(2) and subject to personal jurisdiction in this District.

## PARTIES

15.    Plaintiffs Danny and Sandra Weston are citizens and residents of the state of Colorado. In or around August 2019, Mr. and Mrs. Weston purchased a new 2019 Subaru Forester Premium from Heuberger Subaru, an authorized Subaru dealer, in Colorado Springs, Colorado.

16.    Plaintiffs Mary and Daniel Young are citizens and residents of the state of California. In March 2014, the Youngs purchased a used 2014 Subaru Forester from Putnam Chevrolet in Burlingame, California.

17.    Plaintiff Toni Buchetto Perretta is a citizen and resident of the state of Connecticut. On or around November 22, 2014, Plaintiff Buchetto Perretta purchased a new 2015 Subaru Forester from Stamford Subaru LLC, an authorized Subaru dealer in Stamford, Connecticut.

18.    Plaintiffs Cheryl and David Boucher are citizens and residents of the Commonwealth of Massachusetts. On or around September 30, 2015, the Bouchers purchased a new 2016 Subaru Forester from Steve Lewis Subaru, an authorized Subaru dealer in Hadley, Massachusetts.

19.    Plaintiff David Dian is a citizen and resident of the state of Ohio. On or around December 26, 2017, Plaintiff Dian purchased a new 2018 Subaru Outback from Brunswick Auto Mart, an authorized Subaru dealer in Brunswick, Ohio.

20.    Plaintiffs Martin and Margaret Greenwald are citizens and residents of the state of New Jersey. In 2015, the Greenwalds purchased a new 2014 Subaru

Forester Premium from Burke Subaru, an authorized Subaru dealer, in Cape May Court House, New Jersey.

21.    Plaintiff Alice Reh is a citizen and resident of the state of New York. On or around January 11, 2017, Plaintiff Reh leased a new 2017 Subaru Forester from Hassett Lincoln-Mercury Sales, Inc., an authorized Subaru dealer in Wantagh, New York.

22.    Plaintiff Kathleen Sears is a citizen and resident of the state of North Carolina. On or around July 13, 2017, Plaintiff Sears purchased a new 2018 Subaru Forester from Randy Marin Subaru, an authorized dealer in Morrisville, North Carolina.

23.    Plaintiff Sushma Narula is a citizen and resident of the state of Florida. In March 2015, Plaintiff Narula's husband, now deceased, purchased a new 2015 Subaru Legacy from John Kennedy Subaru, Inc., an authorized dealer in Plymouth Meeting, Pennsylvania. Plaintiff Narula has owned the vehicle since her husband passed away in March 2017.

24.    Plaintiff Katherine Spagnolo is a citizen and resident of the Commonwealth of Virginia. On or around September 26, 2016, Plaintiff Spagnolo purchased a new 2017 Subaru Forester from RK Subaru, an authorized dealer in Virginia Beach, Virginia.

25.    Defendant Subaru Corporation f/k/a Fuji Heavy Industries Ltd.("Subaru Corp.") is a Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan. Defendant Subaru Corp. is the parent company of SOA and is responsible for the design, manufacturing,

distribution, marketing, sales and service of Subaru vehicles, including the Vehicles, around the world, including in the United States.

26.    Defendant SOA is incorporated in New Jersey and has its principal place of business and headquarters in Camden, New Jersey. It is there that SOA has a 250,000 square foot headquarters campus, wherein approximately 600 employees, including its officers, and the sales, marketing, and distribution departments, among others, are based and carry out the business of SOA. There also is an approximately 100,000 square foot national service training center for SOA adjacent to its headquarters campus, which houses service training, service engineering and product engineering functions. SOA markets and distributes automobiles throughout the United States and is a division of the Japanese conglomerate Subaru Corp.

27.    SOA is the U.S. sales and marketing subsidiary of Subaru Corp. and wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States. SOA has a nationwide dealership network and operates offices and facilities throughout the United States.

28.    In order to sell vehicles to the general public, SOA enters into agreements with dealerships who are then authorized to sell Subaru-branded vehicles to consumers such as Plaintiffs.  In return for the exclusive right to sell new Subaru vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties SOA provides directly to consumers. These contracts give SOA a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repairs at an authorized dealership are also completed according to

SOA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents. Per the agreements between SOA and the authorized dealers, consumers such as Plaintiffs can receive services under SOA's issued warranties at dealer locations that are convenient to them.

29.    SOA and Subaru Corp. also develop and disseminate the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to the Class Vehicles through the dealership network. SOA is also responsible for the production and content of the information on the Moroney Stickers.

30.    Subaru Corp. and SOA (collectively "Subaru") have common management. Indeed, SOA's sales, marketing and distribution efforts in the United States are headed by corporate officers of Subaru Corp. For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Subaru Corp. in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division and Subaru Overseas Sales and Marketing Divisions 1 and 2. The incoming Chairman of SOA is also a Corporate Senior Vice President of Subaru Corp. who is Chief General Manager of Subaru Overseas and the Vice President in charge of Sales and Marketing, Division 1.

31.    Upon information and belief, Defendant Subaru Corp. communicates with Defendant SOA concerning virtually all aspects of the Subaru products it distributes within the United States.

32.     Defendants manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiffs' vehicles.

## FACTUAL ALLEGATIONS

33.     For years, Subaru has designed, manufactured, distributed, sold, leased and warranted the Class Vehicles. Subaru has marketed and sold thousands of Class Vehicles nationwide, including through its nationwide network of authorized dealers and service providers.

34.     Subaru has thousands of authorized dealerships across the United States, all of which are under Subaru's control. Subaru authorizes these dealerships to sell Subaru vehicles, parts, and accessories and to service and repair Subaru vehicles using Subaru parts. Its net automotive sales through those dealerships for the United States for the fiscal year ending March 31, 2019 totaled 659,700 vehicles or 66% of its global automobile sales, which netted $27,154,995 in sales that same fiscal year.[2] Subaru sells its vehicles to its authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including the Plaintiffs and Class Members, they purchase additional vehicle inventory from Subaru to replace the vehicles sold, increasing Subaru's revenues. Thus, Plaintiffs and Class Members' purchase of Class Vehicles accrues to the benefit of Subaru by increasing its revenues.

---

[2] Subaru Corporation Net Sales and Operating Income by Business Segment, available at: https://www.subaru.co.jp/en/ir/finance/segment.html (last viewed May 11, 2020). Subaru Corporation reports its global automotive sales netted ¥3,014,476, which is approximately $27,154,995 in U.S. dollars using the same exchange ratio used in Subaru's 2019 Consolidated Financial Statements.

## I.    The Warranty

35.    Subaru provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty (the "Warranty") with the purchase or lease of the Class Vehicles.

36.    The Warranty is consistent throughout the Class Period and across the Class Vehicles and provides a three-year/36,000 mile warranty for the Vehicles that expressly covers defects in materials or workmanship.

37.    Subaru represents as part of its Warranty terms that "Every owner of the vehicle during the warranty period shall be entitled to the benefits of these warranties." In other words, the Warranty remains with the Vehicle to the benefit of subsequent purchasers throughout the duration of the Warranty period.

38.    Using the 2017 Warranty by way of example, the Warranty states in relevant part:

### 2017 Warranty

Below is a brief description of the Subaru Limited Warranty for 2017 model year Subaru vehicles that is provided to each buyer by Subaru at no additional charge. Your Subaru Dealer has complete details concerning the warranty and any exclusions and/or restrictions that may apply. Please visit your nearest Subaru Dealer for this further information. Click here for optional extended protection beyond the warranty.

### Who Makes These Warranties

These warranties are made by SUBARU of America, Inc. ("SOA")[1], One Subaru Drive, P.O. Box 9103, Camden, NJ 08101.

### When These Warranties Apply

These warranties only apply if the vehicle was imported or distributed by SOA and sold to the first retail purchaser by an Authorized SUBARU Retailer in the United States. Any and all repairs must be performed by an Authorized

SUBARU Retailer located in the United States**. Every owner of the vehicle during the warranty period shall be entitled to the benefits of these warranties**. If the vehicle is sold or otherwise transferred, it is recommended and requested that the new owner promptly send written notice of the transfer of ownership to SOA at the address indicated above. (emphasis added)

**Warranty Periods**

Warranty coverage begins on the date the vehicle is delivered to the first retail purchaser. If the vehicle was used as a demonstrator or company vehicle before being sold at retail, warranty coverage begins on the date the vehicle was first placed in such service.

**What is Covered**

These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use:

- In any part of the 2017 model year SUBARU which is identified on the inside front cover of this Warranty & Maintenance Booklet(the "vehicle").

- Any Genuine SUBARU Optional Accessories[2]

- In addition, adjustment services are covered one time only during the first 36 months/36,000 miles of operation, whichever comes first.

**New Vehicle Limited Warranty**

BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first. Subject to the exclusions listed in this warranty, it covers the entire vehicle.

39.     Subaru is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Subaru.  Consumers are not given a meaningful choice in the terms of the warranties provided by Subaru, and those warranties are offered on a "take it or leave it" basis.

40.     The warranties and representations contained in the Warranty were and are material to Plaintiffs because Plaintiffs would not have purchased the Class

Vehicles or would not have paid as much as they did if they had known that Subaru would be unable to repair a dangerous defect like the Sudden Acceleration Defect.

## II.    Subaru's Advertising Emphasizes Safety and Reliability

41.    Defendants advertise and emphasize the safety benefits and innovativeness of their engineering group to consumers, specifically representing the following on Subaru's website:



42.    In fact, Subaru has built a loyal customer base by marketing itself as "More than a car company.™" As part of that image, Subaru emphasizes that it cares about its customers and is committed to their safety. Indeed, Subaru touts its "industry-leading safety innovations" and represents to Plaintiffs and the class members on its website and elsewhere:

There's safe, and then there's
**SUBARU SAFE**

When you choose a Subaru, you're not just choosing a car. You're choosing a company with a lifetime commitment to protecting those you love. Learn more about our industry-leading safety innovations, and why Subaru is a leading choice among parents with teen drivers.

43.     Subaru emphasizes in its advertising that consumers should trust the company, should trust that its vehicles are reliable, and should know that Subaru is working for "a greater good." This is reflected on its website, wherein Subaru states:



As Kelley Blue Book's Most Trusted Brand for five years running[1], Subaru of America is committed to building vehicles our customers can rely on while being a part of a greater good.

44.     However, Subaru has made no disclosure in any of its advertisements that the Sudden Acceleration Defect exists, and due to the existence of the Defect, the Class Vehicles are, in fact, dangerous and unreliable in that they are prone to accelerate without warning, often when the driver presses the brake pedal which is contrary to Subaru's repeated representations.

**III.    The Sudden Acceleration Defect Poses A Serious Safety Concern**

45.     The Sudden Acceleration Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous.

46.     The Sudden Acceleration Defect is dangerous, causing the Class Vehicles to unexpectedly accelerate out of the drivers' control. Not only are drivers caught completely off guard by the sudden acceleration, but the surge often occurs

when a driver is trying to slow or stop the Vehicle, substantially increasing the risk of collisions.

47.    Plaintiffs Toni Buchetto Perretta, Cheryl Boucher, Martin and Margaret Greenwald, Alice Reh, and Kathleen Sears experienced such collisions directly as a result of the Defect. The Defect even caused the Greenwalds to be hospitalized. Plaintiffs Danny and Sandra Weston also experienced sudden surges in acceleration, creating concern for their safety in bumper-to-bumper traffic on busy highways, at stop lights, and in parking lots.

## IV.    Subaru Had Superior and Exclusive Knowledge of the Sudden Acceleration Defect

48.    Since 2011, if not earlier, Subaru has designed, manufactured, distributed, sold, and leased the Class Vehicles. As the designer, manufacturer, distributor, seller, and lessor of the Class Vehicles, Subaru knew or should have known about the Defect and its existence in the Class Vehicles. Moreover, according to consumer complaints on NHTSA's website, and the experiences of Plaintiffs Toni Buchetto Perretta and Alice Reh, Subaru actively conducts examinations of Class Vehicles that exhibit the Sudden Acceleration Defect, but refuses to provide the full inspection reports to vehicle owners.

49.    Upon information and belief, the Class Vehicles are defective in at least three primary respects.

50.    First, the Class Vehicles have an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including unintended acceleration. Such systems may consist of integrated mechanical and

electronic devices that perform different functions and transfer signals between the Vehicle's components or networks; algorithms may be programmed to process real-time data generated while driving and detect faults, or errors, among the Vehicle's components or networks.

51.    Additionally, the Class Vehicles' throttle position sensor, throttle body assembly, powertrain control module, hydraulic brake system and/or related components are highly susceptible to malfunction, including but not limited to circuit boards that are faulty due to defective design, manufacture and/or workmanship. Hydraulic brake systems work by transmitting the force from a driver's push on the brake pedal to the wheel brakes through pressurized fluid, converting the fluid pressure into useful energy to brake the wheels. Specifically, when the driver pushes the brake pedal, that force is applied to the master-cylinder piston, which compresses the brake fluid. Meanwhile, the fluid pressure is equally transmitted throughout the fluid to the front and rear wheel cylinder pistons.

52.    Finally, the Class Vehicles' brake override system malfunctions due to defective design, manufacture, and/or workmanship or otherwise is ineffective to sufficiently override acceleration that the driver did not initiate and cannot control.

53.    Federal law requires automakers like Subaru to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

54.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*. Thus, Subaru knew or should have known of the many complaints about the Sudden Acceleration Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Subaru to the Sudden Acceleration Defect.

55.    Complaints filed by consumers with the NHTSA and other websites, which on information and belief Subaru actively monitored during the relevant period, continue to accrue and demonstrate that the Defect is a widespread, dangerous and unresolved problem. Attached hereto as **Exhibit 1** is a sampling of over 200 complaints filed with the NHTSA for the Class Vehicles, which are available on the NHTSA's website, www.safercar.gov. Attached hereto as **Exhibit 2** is a sampling of complaints posted by consumers on third-party websites regarding the Defect in the Class Vehicles.

56.    Many of the complaints reveal that Subaru, through its network of dealers and repair technicians, has been made aware of the Sudden Acceleration Defect. In addition, the complaints indicate that despite having knowledge of the Sudden Acceleration Defect and even armed with knowledge of the exact vehicles affected, Subaru often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

57.    Plaintiffs are informed and believe and, based thereon, allege that before Plaintiffs purchased their respective Class Vehicles, Defendants knew about the Sudden Acceleration Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Defendants and their dealers, testing conducted in response to those consumer complaints, failure rates, the data demonstrating the high volume of complaints and repairs, and other aggregate data from Subaru dealers about the problem.

58.    Subaru is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Subaru conducts tests, including pre-sale durability, reliability, and safety testing, to verify the Class Vehicles and their components are free from defects and align with Subaru's specifications. Thus, Subaru knew or should have known the engine was defective and prone to put drivers in a dangerous position due to the inherent risk of the Sudden Acceleration Defect.

59.    Additionally, Defendants should have learned of this widespread defect from the sheer number of reports received from dealerships. Subaru interacts with individual dealerships to identify potential common defects and has received numerous reports regarding the Defect, as shown in the consumer complaints in Exhibits 1 and 2. Subaru also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

60.    Subaru's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Subaru's

policy that when a repair is made under warranty the dealership must provide Subaru with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Subaru, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

61.    Indeed, at least two consumer complaints made to NHTSA state that Subaru conducted independent investigations into the consumer complaints.

a)    On June 19, 2018, an incident dated February 26, 2015 involving a 2015 Forester was reported as follows (emphases added):

2015 SUBARU FORESTER MADE A RIGHT TURN INTO PARKING SPACE BETWEEN 2 CARS IN A PARKING GARAGE. GOING UPHILL INTO THE SPACE WHEN VEHICLE SURGED AT GREAT SPEED IN A 10 FT DISTANCE HITTING THE WALL AT GREAT SPEED, CAUSING EXTENSIVE FRONT END DAMAGE, DEPLOYING AIRBAGS, AND DISLODGING THE FRONT DASHBOARD. THE 2 CARS ON EITHER SIDE WERE NOT HIT. THE DRIVER SUSTAINED LACERATIONS TO LEGS. THE VEHICLE WAS REPAIRED AT LOU FUSZ SUBARU. THE SECOND EVENT HAPPED ON 7/6/16 (25463 MILES) IN THE SAME PARKING GARAGE, NEAR THE SAME PARKING SPACE. WHILE TURNING INTO THE PARKING SPACE, THE VEHICLE SURGED FORWARD STRIKING THE WALL AT GREAT SPEED. THOUGH THE FRONT END WAS AGAIN DAMAGED, THE AIRBAGS DID NOT DEPLOY. THE DRIVER CHECKED THE NHTSA WEBSITE. THERE WERE A DOZEN SIMILAR REPORTS FOR 2015 THE SUBARU FORESTER WHILE PARKING. ANEIGHBOR WITH A 2015 SUBARU LEGACY HAD THREE INSTANCES OF UNEXPECTED ACCELERATIONS. NO CAUSE WAS IDENTIFIED BUT REPAIRS WERE MADE TO THE CAR AT WEBSTER GROVES SUBARU. IT APPEARS TO HAVE RESOLVED THE PROBLEM.

THE SUBARU FORESTER WAS REPAIRED AT AN INDEPENDENT BODY SHOP AND THEN CHECKED AT WEBSTER GROVES SUBARU. AFTER SPEAKING WITH THE SERVICE MANAGER OF

20

**THE DEALERSHIP THAT SOLD THE CAR TO THE DRIVER (LOU FUSZ), THE SUBARU CORPORATION SENT AN INDEPENDENT MECHANIC (FROM BOSCH EEA) TO EVALUATE THE CAR. THE DRIVER WAS TOLD IN AN EMAIL THAT THE REPORT WAS PROPRIETARY INFORMATION AND NO DETAILS OF THE EVALUATION WERE MADE AVAILABLE. THE EMAIL ONLY REPORTED THE LACK OF ANY PROBLEMS FOUND THAT COULD EXPLAIN THE UNEXPECTED SURGING WHILE PARKING.** THE DRIVER SPOKE WITH THE SERVICE MANAGER AT WEBSTER GROVES SUBARU. SHE WAS UNABLE TO HELP SINCE NO ONE HAD REPRODUCED THE PROBLEM. AS FAR AS SUBARU WAS CONCERNED, THE CAR WAS NORMAL AND OFFERED NO FURTHER HELP. THE CAR HAS NOT BEEN DRIVEN SINCE THE SECOND REPAIRS WERE COMPLETED.[3]

b)  And on April 30, 2019, an incident dated February 7, 2019 involving

a 2012 Forester was reported as follows (emphases added):

VEHICLE EXPERIENCED AN OCCURRENCE OF SUDDEN UNINTENDED ACCELERATION. I HAD MY FOOT ON THE BRAKE AND WAS EASING INTO A PARKING SPACE. ALL OF A SUDDEN, THE ENGINE REVVED, AND THE VEHICLE SURGED AND BEGAN TO MOVE FORWARD ON ITS OWN ACCORD. I WAS UNABLE TO STOP IT USING THE BRAKE. THE VEHICLE WENT OVER 2 PARKING CURBS AND SHRUBBERY AND WAS HEADED INTO TRAFFIC. VEHICLE WAS MOVING AT ABOUT 20-25 MPH SO I WAS ABLE TO STEER IT AND AVOIDED TRAFFIC BY TURNING RIGHT, STAYING ON PARKING LOT GRASS & ROCK BARRIER. CAR WENT INTO GULLY AND EVENTUALLY STOPPED ON ITS OWN. **DEALERSHIP WAS UNABLE TO FIND PROBLEM. CONTACTED CORPORATE OFFICE WHO HAD VEHICLE INSPECTED BY AUTO ENGINEERING FIRM AND NO PROBLEM DETECTED.** SINCE SOME RECURRENT ISSUES REPORTED ON SAFETY BOARDS, DECISION

---

[3] https://www.nhtsa.gov/vehicle/2015/SUBARU/FORESTER/SUV/AWD#complaints423

MADE TO TRADE IN VEHICLE. DEALERSHIP REPAIRED DAMAGE TO THE VEHICLE AND NOW HAS CAR UP FOR SALE; WE HAVE MANY CONCERNS ABOUT THIS VEHICLE BEING SOLD TO UNSUSPECTING CUSTOMER.[4]

62.    Many consumer complaints made to NHTSA, a sample of which is listed below, also state that the dealership was made aware of the problems caused by the Defect:

a)    On September 30, 2013, the following incident dated September 22, 2013 was reported:[5]

TL* THE CONTACT OWNS A 2012 SUBARU FORESTER. THE CONTACT STATED THAT WHILE PARKING, HE SHIFTED INTO REVERSE WITH HIS FOOT ON THE BRAKES WHEN THE VEHICLE SUDDENLY ACCELERATED WITHOUT WARNING. THE CONTACT ENGAGED THE EMERGENCY BRAKE BUT IT FAILED TO STOP THE VEHICLE. AS A RESULT, THE CONTACT CRASHED INTO ANOTHER VEHICLE AND THEN INTO A TREE. A POLICE REPORT WAS FILED AND NO INJURIES WERE REPORTED. THE VEHICLE WAS DESTROYED. THE DEALER WAS MADE AWARE OF THE FAILURE. THE MANUFACTURER WAS NOT MADE AWARE OF THE PROBLEM. THE FAILURE AND CURRENT MILEAGE WAS 34,500. UPDATED 11/14/13*CN

b)    On September 21, 2014, the following incident dated September 16, 2014 was reported:[6]

I WAS MAKING A ROUTINE VISIT TO MY MOTHER AT HER APARTMENT. TURNED LEFT

---

[4] https://www.nhtsa.gov/vehicle/2012/SUBARU/FORESTER/SUV/AWD#complaints383

[5] https://www.nhtsa.gov/vehicle/2012/SUBARU/FORESTER/SUV/AWD

[6] https://www.nhtsa.gov/vehicle/2014/SUBARU/FORESTER/SUV/AWD

INTO THE COMPLEX THEN TURNED RIGHT AND WENT UP A SMALL HILL. AT THE TOP OF THE HILL AT NO MORE THAN 5-10 MPH I TURNED FAIRLY SHARPLY TO THE RIGHT TO ENTER THE PARKING SPACE. AT THAT POINT THE VEHICLE SUDDENLY ACCELERATED AND SURGED FORWARD. THE VEHICLE HIT A TREE APPROXIMATELY 15-20 FEET AWAY. THE FORCE OF THE CRASH CAUSED THE DRIVER SIDE AIRBAG TO DEPLOY AND THE FRONT END RECEIVED EXTENSIVE DAMAGE RESULTING IN THE TOTAL LOSS OF THE VEHICLE. I'VE BEEN DRIVING FOR OVER 30 YEARS WITH NO ACCIDENTS AND CONSIDER MYSELF AN EXCELLENT DRIVER. OF COURSE I QUESTIONED WHETHER OR NOT I COULD HAVE HIT THE GAS BY MISTAKE, BUT THIS VISIT IS SO ROUTINE AND HAVE MADE THIS SAME TURN INTO THE PARKING SPACE SO MANY TIMES, I DON'T BELIEVE THAT IS THE CASE. IT'S HARD TO BELIEVE THAT THE VEHICLE COULD HAVE SURGED FORWARD AND HIT THE TREE WITH THAT MUCH FORCE IN SUCH A SHORT DISTANCE. LUCKILY THERE WERE NO OTHER PEOPLE INVOLVED AS I WAS ALONE IN THE VEHICLE. I CAN'T HELP BUT WONDER HOW MUCH WORSE IT COULD HAVE BEEN. I DID REPORT THE INCIDENT TO THE SUBARU DEALER AND WILL BE MAKING A REPORT TO THE MANUFACTURER SUBARU OF AMERICA. *TR

c) On August 30, 2019, the following incident dated January 15, 2019

   was reported:[7]

JANUARY 2019. THE ISSUE STARTED AS CEL CAME ON. ROUGH IDLE, SURGE OF POWER AND THEN CAM TIMING BECAME ISSUE. WAS AT A STOP SIGN IDLING WHEN SURGE OCCURRED LURCHING VEHICLE FORWARD. TOOK TO DEALER WAITED WEEKS FOR A TECHNICAL REPRESENTATIVE TO GIVE ADVICE TO DEALERSHIP. TOOK TO OTHER DEALER TO CONFIRM. THEY REPLACED TIMING CHAIN., CAM PHASERS AND OTHER REQUIRED. DIDNT SOLVE ISSUE. NEXT STEP WAS INTERNAL OIL

---

[7] https://www.nhtsa.gov/vehicle/2014/SUBARU/FORESTER/SUV/AWD

FILTERS THAT SUPPLY AVSC TIMING. NO FIX. REPLACED ECM AS FINAL STEP IN SUBARU MATRIX. RAN FOR 3 WEEKS AND SEVERAL THOUSAND DOLLARS. AGAIN CEL, ROUGH IDLE, CAM ISSUES. SUBARU POINTS TO DEALER. DEALER POINTS TO SUBARU. AND I HAVE A INOPERABLE VEHICLE. I REPLACED ALL REQUIRED PARTS AND HAVE ONGOING ISSUE. SOA HAS BEEN INVOLVED BUT NOT RESOLUTION. IT HAS BEEN 8 MONTHS OF DISAPPOINTMENT. GREAT CAR BUT THIS IS TOO MUCH TO CONTINUE TO DEAL WITH. THE XT HAS BEEN KNOWN TO HAVE ISSUES, RECALL ON POSSIBLE CYCLINDER CRACKING AND ISSUES RELATING TO ENGINE PERFORMANCE.

## V.  Defendants Have Actively Concealed the Defect

63. Despite their knowledge of the Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair:

a) failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Sudden Acceleration Defect;

b) failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

c) failed to disclose and/or actively concealed the fact that the Class Vehicles were defective, despite the fact that Subaru learned of the Sudden Acceleration Defect before it placed the Class Vehicles in the stream of commerce.

64.    Moreover Subaru inspects vehicles of Class Members who report collisions due to the Sudden Acceleration Defect, but fails or refuses to provide the full inspection results to the vehicle owners.  At best, Subaru provides vehicle owners with selective summarized points of the inspection, often blaming the consumer for the collision.

65.    More troublingly, Subaru is aware that vehicles that have been involved in collisions caused by the Defect may be sold to unsuspecting consumers after the vehicles are traded in or surrendered due to expiration of a vehicle lease.  After Subaru conducts its inspection of vehicle involved in a collision, vehicle owners, are afraid to drive their vehicles and are forced to sell them to purchase a replacement vehicle. Similarly, Plaintiff Reh, who stopped driving her vehicle after Subaru's inspection following her collision, returned her vehicle to the Subaru dealership at the end of her lease term. Upon information and belief, Subaru does not take any action to prevent these vehicles from being resold to consumers with the uncorrected Defect and fails to disclose the existence of the Defect to potential purchasers.

66.    Defendants have deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at their dealerships or other third-party repair facilities and/or take other remedial measures related to the Sudden Acceleration Defect contained in the Class Vehicles. Moreover, on information and belief when vehicles are brought to Defendants' dealers for repair, Class Members are provided with ineffective repairs in which one defective component is replaced with another. As a result, Class Members continue to experience the Sudden Acceleration Defect even after paying

for repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing) and diminution in value is not sufficient. Moreover, diminution in value is not sufficient for Class Members who experienced a total loss of their vehicles in a collision due to the Sudden Acceleration Defect. A remedial scheme which also makes available a fix and/or warranty extension is necessary to make Class Members whole and prevent collisions involving the Class Vehicles.

67.     Defendants have not recalled the Class Vehicles to repair the Sudden Acceleration Defect, have not offered to its customers a suitable repair or replacement of parts related to the Sudden Acceleration Defect free of charge, and have not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Sudden Acceleration Defect.

68.     Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

69.     As a result of the Sudden Acceleration Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

70.     The existence of the Sudden Acceleration Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Plaintiffs and other Class Members known of the

Sudden Acceleration Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

71.    Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that Subaru will not sell or lease vehicles with known safety defects, such as the Sudden Acceleration Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

72.    On information and belief, the Class Vehicles do not function as Subaru intended; no manufacturer intends for a vehicle to suddenly accelerate in a manner that places the vehicle and its passengers in harm's way.

## VI.    Defendants Have Unjustly Retained A Substantial Benefit

73.    On information and belief, Plaintiffs allege that Defendants unlawfully failed to disclose the alleged defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

74.    Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

75.    As discussed above therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

76.     Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

## VII.    Plaintiffs' Experiences

**Plaintiffs Danny and Sandra Weston**

77.     Plaintiffs Danny and Sandra Weston are Colorado citizens who reside in Colorado.

78.     In or around August 2019, Mr. and Mrs. Weston purchased a new 2019 Subaru Forester Premium from Heuberger Subaru, an authorized Subaru dealer, in Colorado Springs, Colorado.

79.     Mr. and Mrs. Weston purchased their vehicle primarily for personal, family, or household use.

80.     Passenger safety and reliability were important factors in the Westons' decision to purchase their vehicle. Specifically, Mr. and Mrs. Weston spoke with the dealership's sales representative, who showed Plaintiffs that their Class Vehicle earned high safety ratings from Consumer Reports and U.S. News and World Reports. Plaintiffs also recall generally seeing television commercials which described the vehicle prior to their purchase, as well as magazine ads in AARP publications. Additionally, Plaintiffs test-drove a Subaru Forester with the sales representative. Relying on these representations and advertisements, Mr. and Mrs. Weston believed that the Forester would be a safe and reliable vehicle. When the Westons purchased their vehicle, they were unaware that the vehicle contained the Sudden Acceleration Defect.

81.    Mr. and Mrs. Weston were never informed by the dealer sales representative that their vehicle suffered from the Defect. Defendants' omissions were material to Mr. and Mrs. Weston. Had Defendants disclosed their knowledge of the Defect before they purchased their vehicle, Plaintiffs would have seen and been aware of the disclosures. Furthermore, had they known of the Defect, Mr. and Mrs. Weston would not have purchased their vehicle, or would have paid less for it.

82.    Within several weeks after purchasing the vehicle, Plaintiffs experienced surges in acceleration while pressing the brake pedal. On or around September 3, 2019, with 897 miles on the odometer, Mr. Weston took the vehicle to Heuberger Subaru and complained of the sudden acceleration. Despite these complaints, the dealership failed to conduct any repairs.

83.    Not surprisingly, despite this visit, the Westons' vehicle continues to exhibit the Sudden Acceleration Defect. The Westons' vehicle has fewer than 4,500 miles on the odometer and is within the warranty period.

84.    At all times, Mr. and Mrs. Weston have attempted to drive their vehicle in a foreseeable manner in the sense that the Westons have not abused their vehicle or used it for purposes unintended by Subaru such as drag racing, for example. However, despite their normal and foreseeable driving, the Sudden Acceleration Defect has rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiffs Mary and Daniel Young**

85.    Plaintiffs Mary and Daniel Young ("Youngs") are California citizens who reside in Santa Cruz, California.

86.    In March 2014, the Youngs purchased a used 2014 Subaru Forester from Putnam Chevrolet, part of "Putnam Burlingame Dealer group[, which] includes . . . Putnam Subaru,"[8] an authorized Subaru dealership in Burlingame, California. At the time of purchase, the vehicle had about 543 miles on the odometer.

87.    The Youngs purchased their vehicle primarily for personal, family, or household use.

88.    Passenger safety and reliability were important factors in the Youngs' decision to purchase their vehicle. The Youngs researched the vehicle on several websites and were specifically impressed by its high ratings for safety. Before purchasing the vehicle, they visited several different dealerships and discussed the vehicle's features, performance, and operation with dealership representatives, at least one of which touted the vehicle as one of the safest vehicles available. They also reviewed the vehicle's window sticker and written materials and test drove the vehicle before purchase. Relying on these representations and advertisements, the Youngs believed that the Forester would be a safe and reliable vehicle. When the Youngs purchased their vehicle, they were unaware that the vehicle contained the Sudden Acceleration Defect.

89.    The Youngs were never informed by the dealer sales representative that their vehicle suffered from the Defect. Defendants' omissions were material to the Youngs. Had Defendants disclosed their knowledge of the Defect before the Youngs

---

[8] https://www.putnamsubaruofburlingame.com/dealership/about.htm

purchased their vehicle, the Youngs would have seen and been aware of the disclosures. Furthermore, had they known of the Defect, the Youngs would not have purchased their vehicle, or would have paid less for it.

90.    Shortly after purchasing their vehicle, the Youngs experienced delayed acceleration and surges in acceleration. The Youngs complained of the acceleration issues to Subaru of Santa Cruz, the authorized Subaru dealership where the Youngs have taken their vehicle for maintenance and repairs. Although the Youngs had the vehicle serviced a number of times for regular maintenance and other issues, such as the radio/display navigation unit, the dealership has never addressed the acceleration issue.

91.    On or around July 15, 2019, Mrs. Young was driving slowly in a parking lot with Mr. Young as passenger. As she slowly turned the vehicle into a parking spot with her foot on the brake pedal, the vehicle suddenly and unintentionally accelerated, drove over the raised curb in front of the parking spot, and collided with a tree. The sudden acceleration occurred without warning and without Ms. Young's pressure on the accelerator pedal. As a result of this incident, the Youngs' vehicle was totaled.

92.    On or around July 16, 2019, the Youngs reported the collision from the sudden and unexpected acceleration to NHTSA and to Subaru's corporate offices. Because the Youngs' totaled vehicle was in the possession of its insurer, the Youngs referred Subaru to their insurer for any inspection or information Subaru desired to obtain. Subaru did not inspect their vehicle.

93.    At all times, the Youngs attempted to drive their vehicle in a foreseeable manner in the sense that the Youngs did not abuse their vehicle or use it for purposes unintended by Subaru such as drag racing, for example. However, despite their normal and foreseeable driving, the Sudden Acceleration Defect rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Toni Buchetto Perretta**

94.    Plaintiff Toni Buchetto Perretta is a Connecticut citizen who resides in Stamford, Connecticut.

95.    On or around November 22, 2014, Plaintiff Buchetto Perretta purchased a new 2015 Subaru Forester from Stamford Subaru LLC, an authorized Subaru dealer in Stamford, Connecticut.

96.    Plaintiff Buchetto Perretta purchased her vehicle primarily for personal, family, or household use.

97.    Passenger safety and reliability were important factors in Plaintiff Buchetto Perretta's decision to purchase her vehicle. Specifically, Plaintiff Peretta reviewed the vehicle's Monroney window sticker, discussed the vehicle's features, performance, and operation with an authorized Subaru dealership representative, and test drove the vehicle.  Based upon Subaru's advertising, Plaintiff Buchetto Perretta believed that the Forester would be a safe and reliable vehicle. When Plaintiff Buchetto Perretta purchased her vehicle, she was unaware that her vehicle contained the Sudden Acceleration Defect.

98.    Plaintiff Buchetto Perretta was never informed by the dealer sales representative that her vehicle suffered from the Defect. Defendants' omissions were

material to Plaintiff Buchetto Perretta. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Buchetto Perretta would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Buchetto Perretta would not have purchased her vehicle, or would have paid less for it.

99.     On or around December 30, 2019, with approximately 24,000 miles on the odometer, Plaintiff was driving slowly in a parking lot with her foot on the brake pedal. As she was about to put her vehicle into the "park" position, the vehicle, without warning, accelerated and collided with the vehicle in front of her. Both vehicles sustained damage due to the collision.

100.    After the collision, a Bosch field inspector examined Plaintiff's vehicle for Subaru. However, Subaru did not provide the inspection report to Plaintiff.

101.    Due to the the collision caused by the Sudden Acceleration Defect, Plaintiff Buchetto Perretta was afraid to drive her Class Vehicle. Her only option was to stop driving her Class Vehicle and to trade it in for a fraction of what she paid for the new vehicle. At all times during her ownership, Plaintiff Buchetto Perretta attempted to drive her vehicle in a foreseeable manner in the sense that  Plaintiff Buchetto Perretta did not abuse her vehicle or use it for purposes unintended by Subaru such as drag racing, for example. However, despite her normal and foreseeable driving, the Sudden Acceleration Defect rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiffs Cheryl and David Boucher**

102.   Plaintiffs Cheryl and David Boucher ("Bouchers") are Massachusetts citizens who reside in Hadley, Massachusetts.

103.   On or around September 30, 2015, the Bouchers purchased a new 2016 Subaru Forester from Steve Lewis Subaru, an authorized Subaru dealer in Hadley, Massachusetts.

104.   The Bouchers purchased their vehicle primarily for personal, family, or household use.

105.   Passenger safety and reliability were important factors in the Bouchers' decision to purchase their vehicle. Specifically, the Bouchers researched the vehicle online, reviewed the vehicle's Monroney window sticker and other sales brochures provided by the dealership, discussed the vehicle's features, performance, and operation with an authorized Subaru dealership representative about the vehicle, and test drove the vehicle before purchase. Relying on these representations and advertisements, the Bouchers believed that the Forester would be a safe and reliable vehicle. When the Bouchers purchased their vehicle, they were unaware that the vehicle contained the Sudden Acceleration Defect.

106.   The Bouchers were never informed by the dealer sales representative that their vehicle suffered from the Defect. Defendants' omissions were material to the Bouchers. Had Defendants disclosed their knowledge of the Defect before they purchased their vehicle, the Bouchers would have seen and been aware of the disclosures. Furthermore, had they known of the Defect, the Bouchers would not have purchased their vehicle, or would have paid less for it.

107.  Several months after purchasing their vehicle, the Bouchers experienced delayed acceleration and surges in acceleration, particularly while pressing the brake pedal.

108.  In early 2020, Ms. Boucher was driving slowly in the parking lot of the Big Y grocery store with her foot on the brake pedal. As she was slowly pulling her vehicle into the parking spot, the vehicle, without warning, accelerated and lurched forward with such force that Ms. Boucher pressed both feet on the brake pedal. Ms. Boucher took the vehicle to Steve Lewis Subaru and complained of the sudden acceleration. Despite these complaints, the dealership failed to conduct any repairs or acknowledge the sudden acceleration problem.

109.  On or around May 18, 2020, Ms. Boucher was driving the Bouchers' Forester in the parking lot of a Home Depot with her foot on the brake pedal. As she turned the vehicle slowly into a parking spot, the vehicle suddenly accelerated and drove over a center curb divider in front of the parking space. Ms. Boucher's vehicle collided with the vehicle in front of her, which flipped over onto its side and collided with yet another vehicle. Ms. Boucher had to be cut out of her vehicle to be transported to the hospital, having sustained physical injuries. Both the Bouchers' Forester, which was totaled, and the first car in the collision were towed from the parking lot with significant damage.

110.  At all times, the Bouchers attempted to drive their vehicle in a foreseeable manner in the sense that the Bouchers did not abuse their vehicle or use it for purposes unintended by Subaru such as drag racing, for example. However,

despite their normal and foreseeable driving, the Sudden Acceleration Defect rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiffs Martin and Margaret Greenwald**

111.   Plaintiff Martin and Margaret Greenwald ("Greenwalds") are New Jersey citizens who reside in Wildwood Crest, New Jersey.

112.   In 2015, the Greenwalds purchased a new 2014 Subaru Forester Limited from Burke Subaru, an authorized Subaru dealer, in Cape May Court House, New Jersey.

113.   The Greenwalds purchased their vehicle primarily for personal, family, or household use.

114.   Passenger safety and reliability were important factors in the Greenwalds' decision to purchase their vehicle. Specifically, the Greenwalds researched the vehicle online, reviewed the vehicle's Monroney window sticker and other sales brochures provided by the dealership, discussed the vehicle's features, performance, and operation with an authorized Subaru dealership representative about the vehicle, and test drove the vehicle before purchase. Relying on these representations and advertisements, the Greenwalds believed that the Forester would be a safe and reliable vehicle. When the Greenwalds purchased their vehicle, they were unaware that the vehicle contained the Sudden Acceleration Defect.

115.   The Greenwalds were never informed by the dealer sales representative that their vehicle suffered from the Defect. Defendants' omissions were material to the Greenwalds. Had Defendants disclosed their knowledge of the Defect before they purchased their vehicle, the Greenwalds would have seen and been aware of the

disclosures. Furthermore, had they known of the Defect, the Greenwalds would not have purchased their vehicle, or would have paid less for it.

116.    On or around March 28, 2020, with approximately 80,000 miles on the odometer, Mr. Greenwald was driving the Greenwalds' Forester on U.S. 64 in Henderson County, North Carolina. His wife was in the passenger seat. Mr. Greenwald pressed the brake pedal to slow the vehicle, but instead, the vehicle suddenly accelerated, which caused Mr. Greenwald to lose control of the vehicle. The car veered off the road, struck a guardrail, and flipped over. Mr. and Mrs. Greenwald were taken to the hospital, having sustained physical injuries, and their Forester was totaled.

117.    At all times, the Greenwalds attempted to drive their vehicle in a foreseeable manner in the sense that the Greenwalds did not abuse their vehicle or use it for purposes unintended by Subaru such as drag racing, for example. However, despite their normal and foreseeable driving, the Sudden Acceleration Defect rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Alice Reh**

118.    Plaintiff Alice Reh is a New York citizen who resides in Wantagh, New York.

119.    On or around January 11, 2017, Plaintiff Reh leased a new 2017 Subaru Forester from Hassett Lincoln-Mercury Sales, Inc., an authorized Subaru dealer in Wantagh, New York.

120.    Plaintiff Reh purchased her vehicle primarily for personal, family, or household use.

121.   Passenger safety and reliability were important factors in Plaintiff Reh's decision to lease her vehicle, particularly because she wanted a safe vehicle to transport her two young grandchildren. Specifically, Plaintiff viewed Subaru commercials touting the vehicle's safety and researched the vehicle before leasing it, viewing favorable customer reviews online. In addition, before the lease, Plaintiff Reh reviewed the vehicle's window sticker and sales brochures, as well as test driving the vehicle and discussing the vehicle's features, performance, and operation with an authorized Subaru dealership representative. Based upon Subaru's advertising, Plaintiff Reh believed that the Forester would be a safe and reliable vehicle. When Plaintiff Reh leased her vehicle, she was unaware that her vehicle contained the Sudden Acceleration Defect.

122.   Plaintiff Reh was never informed by the dealer sales representative that her vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Reh. Had Defendants disclosed their knowledge of the Defect before she leased her vehicle, Plaintiff Reh would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Reh would not have leased her vehicle, or would have paid less for it.

123.   On or around September 14, 2019, Plaintiff was driving slowly in a parking lot. As she was about to pull into a parking space with her foot on the brake pedal, her vehicle accelerated without warning, drove over a curb, and collided with a tree in front of the parking space. The vehicle then went into reverse, spinning around as Plaintiff Reh could not control the car, and finally stopped only after Plaintiff Reh turned off the vehicle. Plaintiff's vehicle was towed to a local facility

to repair the collision damage, and she paid approximately $1,000 of her insurance deductible for these repairs, among other expenses she incurred due to the accident.

124.   In or around September 2019, Plaintiff Reh reported the details of the accident to Subaru's corporate offices, including the sudden and unintended acceleration that caused severe damage to her vehicle and imperiling her safety. After several months of investigating the incident and her vehicle, Subaru's corporate representatives blamed Plaintiff Reh for the accident and refused her request for Subaru's official report containing their investigation.

125.   After the collision, Plaintiff Reh was afraid to drive her Class Vehicle due to the Sudden Acceleration Defect. She stopped driving her Class Vehicle and surrendered it at the expiration of the lease term, in January 2020.

126.   At all times during her lease term, Plaintiff Reh attempted to drive her vehicle in a foreseeable manner in the sense that Plaintiff Reh did not abuse her vehicle or use it for purposes unintended by Subaru such as drag racing, for example. However, despite her normal and foreseeable driving, the Sudden Acceleration Defect rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiff Kathleen Sears**

127.   Plaintiff Kathleen Sears is a North Carolina citizen who resides in North Carolina.

128.   On or around July 13, 2017, Plaintiff Sears purchased a new 2018 Subaru Forester from Randy Marin Subaru, an authorized dealer in Morrisville, North Carolina.

129.    Plaintiff Sears purchased her vehicle primarily for personal, family, or household use.

130.    Passenger safety and reliability were important factors in Plaintiff Sears's decision to purchase her vehicle. Specifically, Plaintiff researched the vehicle online before purchase. In addition, before purchase, Plaintiff Sears reviewed the vehicle's window sticker and discussed the vehicle's features, performance, and operation with an authorized Subaru dealership representative. Based upon Subaru's advertising, Plaintiff Sears believed that the Forester would be a safe and reliable vehicle. When Plaintiff Sears purchased her vehicle, she was unaware that her vehicle contained the Sudden Acceleration Defect.

131.    Plaintiff Sears was never informed by the dealer sales representative that her vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Sears. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Sears would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Sears would not have purchased her vehicle, or would have paid less for it.

132.    On or around November 14, 2019, Plaintiff was driving slowly into a parking space with her foot on the brake pedal. Without warning, her vehicle accelerated and crashed into the fence in front of the parking space. Shortly thereafter, Plaintiff took her vehicle to North Point Motors, Inc., in Winston-Salem, North Carolina to repair the collision damage. Plaintiff paid approximately $800 for these repairs.

133.    Plaintiff Sears's vehicle has fewer than 25,000 miles on the odometer and is within the warranty period.

134.    At all times, Plaintiff Sears has attempted to drive her vehicle in a foreseeable manner in the sense that Plaintiff Sears has not abused her vehicle or used it for purposes unintended by Subaru such as drag racing, for example. However, despite her normal and foreseeable driving, the Sudden Acceleration Defect has rendered her vehicle unsafe and unfit to be used as intended.

**Plaintiff David Dian**

135.    Plaintiff David Dian is a Ohio citizen who resides in North Royalton, Ohio.

136.    On or around December 26, 2017, Plaintiff Dian purchased a new 2018 Subaru Outback from Brunswick Auto Mart, an authorized Subaru dealer in Brunswick, Ohio.

137.    Plaintiff Dian purchased his vehicle primarily for personal, family, or household use.

138.    Passenger safety and reliability were important factors in Plaintiff Dian's decision to purchase his vehicle. Specifically, Plaintiff Dian viewed the vehicle's webpage on Subaru's website and favorable customer reviews online. At the dealership and before purchase, Plaintiff Dian reviewed the vehicle's written sales brochures and test drove the vehicle on Interstate 71 with an authorized Subaru dealership representative. During the test drive, Plaintiff Dian discussed the vehicle's features, performance, and operation with the dealership representative, who touted the vehicle's safety and reliability. Based upon Subaru's advertising,

Plaintiff Dian believed that the Outback would be a safe and reliable vehicle. When Plaintiff Dian purchased his vehicle, he was unaware that her vehicle contained the Sudden Acceleration Defect.

139.    Plaintiff Dian was never informed by the dealer sales representative that his vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Dian. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Dian would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Dian would not have purchased his vehicle, or would have paid less for it.

140.    Shortly after purchasing the vehicle, Plaintiff experienced surges in acceleration while pressing the brake pedal. On or around July 17, 2018, with 2,694 miles on the odometer, Plaintiff Dian took the vehicle to Brunswick Auto Mart. According to the dealership's service records, Mr. Dian reported to them that "when he applied [*sic*] the brake the car jerked forward and there is too much travel in the pedal" requesting service "because it is a safty [*sic*] hazard." After the dealership inspected the vehicle, they returned it to Mr. Dian without repairs, explaining that it "work[ed] as designed, the travel of the brake pedal is within specification of Subaru standards, all of cars brake pedals feel like they have travel, checked the brake booster, pulled the wheels off and did a through [*sic*] brake inspection and no pads were hanging up or no caliper pins are seized. Front brake pads are at 10mm and rear pads are at 8 mm."

141.    Dissatisfied with the dealership's faiure to conduct repairs, Plaintiff Dian then called Subaru's corporate office to complain of the sudden acceleration

defect, who told him they were unaware of any issue and failed to offer any additional assistance or corrective action.

142.   Plaintiff Dian's vehicle continues to exhibit the Sudden Acceleration Defect. His vehicle has appropximately 34,500 miles on the odometer and is within the warranty period.

143.   At all times, Plaintiff Dian has attempted to drive his vehicle in a foreseeable manner in the sense that he has not abused his vehicle or used it for purposes unintended by Subaru such as drag racing, for example. However, despite his normal and foreseeable driving, the Sudden Acceleration Defect has rendered his vehicle unsafe and unfit to be used as intended.

**Plaintiff Sushma Narula**

144.   Plaintiff Sushma Narula is a Florida citizen who resides in Tampa, Florida.

145.   In March 2015, Plaintiff Narula's husband, now deceased, purchased a new 2015 Subaru Legacy from John Kennedy Subaru, Inc., an authorized dealer in Plymouth Meeting, Pennsylvania. Plaintiff Narula has owned the vehicle since her husband passed away in March 2017.

146.   Plaintiff and her husband (the "Narulas") purchased their vehicle primarily for personal, family, or household use.

147.   Passenger safety and reliability were important factors in the Narulas decision to purchase the vehicle. Specifically, the Narulas viewed the vehicle's information page on Subaru's website before purchase. In addition, before purchase, the Narulas reviewed the vehicle's window sticker and discussed the vehicle's

features, performance, and operation with an authorized Subaru dealership representative. Based upon Subaru's advertising, the Narulas believed that the Legacy would be a safe and reliable vehicle. When the Narulas purchased the vehicle, they were unaware that their vehicle contained the Sudden Acceleration Defect.

148.    The Narulas were never informed by the dealer sales representative that their vehicle suffered from the Defect. Defendants' omissions were material to the Narulas. Had Defendants disclosed their knowledge of the Defect before the Narulas purchased their vehicle, the Narulas would have seen and been aware of the disclosures. Furthermore, had the Narulas known of the Defect, the Narulas would not have purchased their vehicle, or would have paid less for it.

149.    Soon after purchasing the vehicle, the Narulas experienced surges in acceleration when tapping the accelerator pedal lightly and when slowly accelerating from a stop. In May 2015, with approximately 1,390 miles on the odometer, Mr. Narula took the vehicle to John Kennedy Subaru and, according the the service order, complained that "when at a stop and accelerating the [*sic*] jumps." In response, the dealership service technician stated that this "is normal operation oc [*sic*] CVT transmission."  Although the Narulas had the vehicle serviced at Subaru authorized dealerships a number of times and raised the acceleration issue again, the dealerships failed to make any repairs.

150.    Plaintiff Narula's vehicle continues to exhibit the Sudden Acceleration Defect.

151.   At all times, the Narulas attempted to drive their vehicle in a foreseeable manner in the sense that the Narulas did not abuse their vehicle or use it for purposes unintended by Subaru such as drag racing, for example. However, despite their normal and foreseeable driving, the Sudden Acceleration Defect rendered their vehicle unsafe and unfit to be used as intended.

**Plaintiff Katherine Spagnolo**

152.   Plaintiff Katherine Spagnolo is a Virginia citizen who resides in Virginia Beach, Virginia.

153.   On or around September 26, 2016, Plaintiff Spagnolo purchased a new 2017 Subaru Forester from RK Subaru, an authorized dealer in Virginia Beach, Virginia.

154.   Plaintiff Spagnolo purchased her vehicle primarily for personal, family, or household use.

155.   Passenger safety, reliability, and the vehicle's longevity were all important factors in Plaintiff Spagnolo's decision to purchase her vehicle. Specifically, Plaintiff researched the vehicle online before purchase and saw television commercials that emphasized safety and longevity. In addition, before purchase, Plaintiff Spagnolo reviewed the vehicle's window sticker and read the warranty information and a recall acknowledgement at the authorized Subaru dealership representative before closing on her sale. Based upon Subaru's advertising, Plaintiff Spagnolo believed that the Forester would be a safe and reliable vehicle that would last for years. When Plaintiff Spagnolo purchased her vehicle, she was unaware that her vehicle contained the Sudden Acceleration Defect.

156.   Plaintiff Spagnolo was never informed by Subaru or the dealer sales representative that her vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Spagnolo. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Spagnolo would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Spagnolo would not have purchased her vehicle, or would have paid less for it.

157.   Plaintiff Spagnolo has experienced her vehicle lurching forward from a stop, or just after a stop, starting to independently accelerate while turning. At higher speeds Plaintiff Spagnolo's vehicle seems to hesitate then accelerate.

158.   On or around August 20, 2018, with 17,096 miles on her odometer, she took her vehicle in to RK Subaru for a repair due to the unintended acceleration issue. The vehicle was under warranty at the time, but was not fixed.

159.   On July 31, 2019, Plaintiff Spagnolo again took her vehicle to be repaired for this problem, this time to Burke Brothers in Cape May Court House, New Jersey. She described the problem to them as more of a hesitation when coming out of a stop, or making strange sounds at high speed.

160.   At all times, Plaintiff Spagnolo has attempted to drive her vehicle in a foreseeable manner in the sense that Plaintiff Spagnolo has not abused her vehicle or used it for purposes unintended by Subaru such as drag racing, for example. However, despite her normal and foreseeable driving, the Sudden Acceleration Defect has rendered her vehicle unsafe and unfit to be used as intended.

## TOLLING OF STATUTES OF LIMITATIONS

161.   Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendants' deception with respect to the Defect. Defendants and their agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

162.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendants were concealing a defect and/or the Class Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

163.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

164.   Defendants knowingly, actively and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

165.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

166.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

167.   The Class and Sub-Classes are defined as:

**Class**: All persons or entities who purchased or leased a 2012-2018 Subaru Forester, 2015-2019 Subaru Legacy, or 2015-2019 Subaru Outback vehicle (Class Vehicle) in the United States.

**California Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of California.

**Colorado Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of Colorado.

**Connecticut Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of Connecticut.

**Massachusetts Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the Commonwealth of Massachusetts.

**New Jersey Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of New Jersey.

**New York Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of New York.

**North Carolina Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of North Carolina.

**Ohio Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of Ohio.

**Pennsylvania Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the Commonwealth of Pennsylvania.

**Virginia Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the Commonwealth of Virginia.

168.   Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

169.   **Numerosity**:   Although  the  exact  number  of  Class  Members  is uncertain, and can only be ascertained through appropriate discovery, the number is significant  enough,  easily  in  the  multiple  thousands,  such  that  joinder  is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class

Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

170. **Typicality**: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing their Class Vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

171. **Commonality**: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include, *inter alia*:

       a) whether the Class Vehicles suffer from the Sudden Acceleration Defect;

       b) whether the Sudden Acceleration Defect constitutes an unreasonable safety hazard;

       c) whether Defendants know about the Sudden Acceleration Defect and, if so, how long Defendants have known of the Defect;

       d) whether the defective nature of the Class Vehicles constitutes a material fact;

e) whether Defendants had and have a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class Members;

f) whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g) whether Defendants knew or reasonably should have known of the Sudden Acceleration Defect contained in the Class Vehicles before they sold or leased them to Class Members; and

h) Whether Defendants breached the implied warranty of merchantability pursuant to state law and/or the UCC;

i) Whether Defendants breached their express warranties under state law and/or the UCC;

j) Whether Defendants violated California's Consumers Legal Remedies Act;

k) Whether Defendants violated California's Business and Professions Code Unfair Competition Law;

l) Whether Defendants violated the Colorado Consumer Protection Act;

m) Whether Defendants violated the Connecticut Unlawful Trade Practices Act;

n) Whether Defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws 93A, § 1, *et seq*.;

o) Whether Defendants violated the New Jersey Consumer Fraud Act;

p) Whether Defendants violated the New York Gen. Bus. Law § 349;

q) Whether Defendants violated the New York Gen. Bus. Law § 350;

r) Whether Defendants violated the North Carolina Unfair and Deceptive Acts and Practices Act;

s) Whether Defendants violated the Ohio Consumer Sales Practices Act;

t) Whether Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

u) Whether Defendants violated the Virginia Consumer Protection Act;

v) Whether Defendants are liable for fraudulent omission; and

w) Whether Defendants were unjustly enriched.

172. **Adequate Representation**:  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

173. **Predominance and Superiority**:  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size

of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## COUNT I
### Breach of Express Warranty
### (On Behalf of the Class, or Alternatively, All Sub-Classes)

174.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

175.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes.

176.   Subaru is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

177.   With respect to leases, Subaru is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

178.   The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

179.   Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the

bargain. Accordingly, Defendants' express warranty is an express warranty under California law.

180.    In a section entitled "What Is Covered," Defendants' Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

181.    According to Subaru, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

182.    The Warranty formed the basis of the bargain that was reached when Plaintiffs and other members of the Classes purchased or leased their Class Vehicles.

183.    Defendants breached the express warranty through the acts and omissions described above.

184.    Plaintiffs and members of the Class have had sufficient direct dealing with either Subaru or its agents (i.e., dealerships and technical support) to establish privity of contract between Subaru, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are the intended third-party beneficiaries of contracts between Subaru and its distributors and dealers, and specifically, of Subaru's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

185.   Any attempt by Defendants to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because Defendants knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Plaintiffs and the members of the Class.  Among other things, Plaintiffs and members of the Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants and unreasonable favored Defendants. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants and members of the Class.

186.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiff and the members of the Class whole, because on information and belief, Defendants have failed and/or have refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

187.   Plaintiffs were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of written warranty would have been futile. Subaru was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

188.   As a result of Defendants' breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

189.   As a result of Defendants' breach of the express warranty, Plaintiffs and Class Members are entitled to legal and equitable relief against Defendants, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### (On Behalf of the Class, or Alternatively, All Sub-Classes)

190.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

191.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes.

192.   Subaru is and was at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

193.   With respect to leases, Subaru is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

194.  The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

195.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under the Uniform Commercial Code and relevant state law.

196.  Subaru knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Subaru directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiffs and members of the Classes bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs and members of the Classes, with no modification to the defective Class Vehicles.

197.  Subaru provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

198.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

199.  Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

200.   As a result of Subaru's breach of the applicable implied warranties, Plaintiffs and members of the Classes of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and members of the Classes were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

201.   Subaru's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

202.   Plaintiffs and members of the Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

203.   Plaintiffs and members of the Classes were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members and through other internal sources.

204.   As a direct and proximate cause of Subaru's breach, Plaintiffs and members of the Classes suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class

Vehicles. Additionally, Plaintiffs and members of the Classes have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

205.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

**COUNT III**
**Violation of the California's Consumers Legal Remedies Act**
**California Civil Code § 1750, *et seq.***
**(On Behalf of the California Sub-Class)**

206.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

207.   Plaintiffs Mary and Daniel Young ("California Plaintiffs") bring this cause of action on behalf of themselves and the California Sub-Class.

208.   Each Defendant is a "person" as defined by California Civil Code § 1761(c).

209.   California Plaintiffs and the Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

210.   By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Defendants violated California Civil Code § 1770(a), as it represented that the Class Vehicles had

characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

211.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

212.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

213.    Defendants were under a duty to California Plaintiffs and the California Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c)  Defendants actively concealed the defective nature of the Class Vehicles from California Plaintiffs and the California Sub-Class Members at the time of sale and thereafter.

214.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

215.    The facts concealed or not disclosed by Defendants to California Plaintiffs and the California Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to

purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had California Plaintiffs and the California Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

216. California Plaintiffs and the California Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

217. As a result of their reliance on Defendants' conduct including omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the Sub-Class members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Defect.

218. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, California Plaintiffs and the California Sub-Class members suffered and will continue to suffer actual damages.

219. California Plaintiffs and the California Sub-Class members are entitled to equitable relief.

220.   California Plaintiffs provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) more than 30 days prior to the filing of this complaint, but Subaru did not take action to remedy those violations.

221.   Included at the end of this Complaint is a declaration of venue and place of trial under California Civil Code Section 1780(d).

**COUNT IV**
**Violation of the California Business & Professions Code**
**California Civil Code § 17200, *et seq.***
**(On Behalf of the California Sub-Class)**

222.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

223.   California Plaintiffs bring this cause of action on behalf of themselves and the California Sub-Class.

224.   As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles, including Plaintiffs, suffered an ascertainable loss of money and/or property, including loss of value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and the California Sub-Class members were harmed and suffered actual loss in that they over paid for their Class Vehicles, which are substantially certain to fail before their expected useful life has run.

225.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

226. Plaintiffs and the California Sub-Class members are reasonable consumers who do not expect their vehicles to accelerate without input from the driver, or to fail to stop upon application of the brake by the driver, and these are material safety concerns.

227. Defendants knew the Class Vehicles were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

228. In failing to disclose the Defect, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

229. Defendants were under a duty to Plaintiffs and the California Sub-Class members to disclose the defective nature of the Class Vehicles because:

   a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c) Defendants actively concealed the defective nature of the Class Vehicles from California Plaintiffs and the California Sub-Class Members at the time of sale and thereafter.

230. The facts Defendants concealed from or failed to disclose to Plaintiffs and the California Sub-Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles. Had they known of the Defect, Plaintiffs and the other California Sub-

Class members would have paid less for Class Vehicles or would not have purchased or leased them at all.

231.    Defendants continued to conceal the defective nature of the Class Vehicles even after Plaintiffs and the other California Sub-Class members began to report problems.

232.    Defendants' conduct was and is likely to deceive consumers.

233.    Defendants' acts, conduct, and practices were unlawful, in that they constituted:

      a)  Violations of California's Consumers Legal Remedies Act;

      b)  Violations of the Song-Beverly Consumer Warranty Act;

      c)  Violations of the Magnuson-Moss Warranty Act; and

      d)  Breach of Express Warranty under California Commercial Code § 2313.

234.    By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices. The actions were unfair in that they were immoral, unethical, oppressive or unscrupulous, contrary to established public policy, and/or any benefit of Defendants' conduct was outweighed by the injuries to consumers associated with selling Class Vehicles with the Defect.

235.    Defendants' unlawful, unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a significant portion of reasonable consumers seeking to purchase vehicles.

236.   As a direct and proximate result of Defendants' unlawful, unfair and deceptive practices, Plaintiffs and the other California Sub-Class members have suffered and will continue to suffer actual injuries.

237.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the other California Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

## COUNT V
**Violation of the Implied Warranty Pursuant to Song-Berberly Consumer Warranty Act**
**California Civil Code §§ 1792 and 1791.1, *et seq.***
**(On Behalf of the California Sub-Class)**

238.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

239.   California Plaintiffs bring this cause of action on behalf of themselves and the California Sub-Class.

240.   Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

241.   Defendants provided California Plaintiffs and the Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

242. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

243. Contrary to the applicable implied warranties, the Class Vehicles and at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiffs and the Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective.

244. The alleged Defect is inherent and was present in each Class Vehicle at the time of sale.

245. As a result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the Sub-Class members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

246. Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1

## COUNT VI
### Violation of the Colorado Consumer Protection Act
### (COLO. REV. STAT. §§ 6-1-101, ET SEQ.)
### (On Behalf of the Colorado Sub-Class)

247.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

248.  Plaintiffs Danny and Sandra Weston ("Colorado Plaintiffs") bring this cause of action on behalf of themselves and the members of the Colorado Sub-Class.

249.  At all times, Defendants were and are "person[s]" within the meaning of the Colorado Consumer Protection Act ("CCPA"), COLO. REV. STAT. § 6-1-102.

250.  The CCPA prohibits a person from engaging in a "deceptive trade practice," including "knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods […];" "represent[ing] that goods, good, services, or property are of a particular standard, quality, or grade, […] if he knows or should know that they are of another;" and "advertis[ing] goods, services, or property with intent not to sell them as advertised." COLO. REV. STAT. § 6-1-105(1)(e), (g), and (i).

251.  Subaru participated in deceptive trade practices that violated the CCPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru

systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

252.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

253.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

254.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

255.   Subaru knew or should have known that its conduct violated the CCPA.

256.   Defendants were under a duty to Colorado Plaintiffs and the Colorado Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from Colorado Plaintiffs and the Colorado Sub-Class Members at the time of sale and thereafter.

257. By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

258. The facts concealed or not disclosed by Defendants to Colorado Plaintiffs and the Colorado Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Colorado Plaintiffs and the Colorado Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

259. Colorado Plaintiffs and the Colorado Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

260. As a result of Defendants' misconduct, Colorado Plaintiffs and the Colorado Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

261.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Colorado Plaintiffs and the Colorado Sub-Class Members have suffered and will continue to suffer actual damages.

262.    Colorado Plaintiffs and the Colorado Sub-Class Members seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the CCPA, as well as an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the CCPA.

## COUNT VII
### Violation of the Connecticut Unlawful Trade Practices Act
### (Conn. Gen. Stat. § 42-110A, *et seq.*)
### (On behalf of the Connecticut Sub-Class)

263.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

264.    Plaintiff Toni Buchetto Perretta ("Connecticut Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Connecticut Sub-Class.

265.    Subaru's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Connecticut Unlawful Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*. ("Connecticut UTPA").

266.    At all relevant times, Defendants were and are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

70

267.    Defendants' conduct, as set forth herein, occurred in the conduct of "trade" or commerce" within the meaning of the Connecticut UTPA. Conn. Gen. Stat. § 42-110a(4).

268.    The Connecticut UTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

269.    Subaru participated in deceptive trade practices that violated the Connecticut UTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

270.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

271.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

272.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

273.   Subaru knew or should have known that its conduct violated the Connecticut UTPA.

274.   Defendants were under a duty to Connecticut Plaintiff and the Connecticut Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c) Defendants actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Sub-Class Members at the time of sale and thereafter.

275.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

276.   The facts concealed or not disclosed by Defendants to Connecticut Plaintiff and the Connecticut Sub-Class Members are material because a reasonable

person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Connecticut Plaintiff and the Connecticut Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

277.    Connecticut Plaintiff and the Connecticut Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

278.    As a result of Defendants' misconduct, Connecticut Plaintiff and the Connecticut Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

279.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Sub-Class Members have suffered and will continue to suffer actual damages.

280.    Connecticut Plaintiffs and the Connecticut Sub-Class Members seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Connecticut UTPA, as well as an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Connecticut UTPA.

281.   Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

**COUNT VIII**
**Violation of the Massachusetts Consumer Protection Law**
**Mass. Gen. Laws Ch. 93A**
**(On Behalf of the Massachusetts Sub-Class)**

282.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

283.   Plaintiffs Cheryl and David Boucher ("Massachusetts Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Massachusetts Sub-Class.

284.   Subaru, Massachusetts Plaintiffs, and the Massachusetts Sub-Class Members are "persons" within the meaning of the Mass. Gen. Laws 93A, § 1(a).

285.   Subaru engaged in "trade" or "commerce" within the meaning Mass. Gen. Laws 93A, § 1(b).

286.   Massachusetts's Consumer Protection Law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws 93A, § 2(a).

287.   Subaru participated in deceptive trade practices that violated Mass. Gen. Laws Ch. 93A as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a

reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

288.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

289.    Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

290.    Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

291.    Subaru knew or should have known that its conduct violated Mass. Gen. Laws Ch. 93A.

292.    Defendants were under a duty to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c) Defendants actively concealed the defective nature of the Class Vehicles from Massachusetts Plaintiffs and the Massachusetts Sub-Class Members at the time of sale and thereafter.

293. By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

294. The facts concealed or not disclosed by Defendants to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Massachusetts Plaintiffs and the Massachusetts Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

295. Massachusetts Plaintiffs and the Massachusetts Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the

Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

296.   As a result of Defendants' misconduct, Massachusetts Plaintiffs and the Massachusetts Sub-Class Members have been harmed and have suffered actual damages and/or injury in fact in that the Class Vehicles are defective and require repairs or replacement.

297.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Massachusetts Plaintiffs and the Massachusetts Sub-Class Members have suffered and will continue to suffer asscertainable loss and actual damages as a direct and proximate result of Defendants' conduct.

298.   Pursuant to Mass. Gen. Laws 93A, § 9, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class seek monetary relief against Defendants measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for Massachusetts Plaintiffs and each member of the Massachusetts Sub-Class. Because Defendants' conduct was committed willfully and knowingly, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class are entitled to recover, for Massachusetts Plaintiffs and each Massachusetts Sub-Class member, up to three times actual damages, but no less than two times actual damages, and any other just and proper relief available under Mass. Gen. Laws Ch. 93A.

299.   In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), Massachusetts Plaintiffs have provided Defendants with the appropriate notice and demand, but

Defendants have denied the existence of a defect and refused to provide any relief to Massachusetts Plaintiffs and members of the Massachusetts Sub-Class.

**COUNT IX**
**Violation of the New Jersey Consumer Fraud Act**
**(N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)**
**(On behalf of the New Jersey Sub-Class)**

300.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

301.   Plaintiffs Martin and Margaret Greenwald ("New Jersey Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the New Jersey Sub-Class.

302.   Subaru, New Jersey Plaintiffs, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1(d).

303.   Subaru engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

304.   The NJCFA protects consumers against "[t]he act, the use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J. STAT. ANN. § 56:8-2.

305.   Subaru participated in deceptive trade practices that violated the NJCFA as described below and alleged throughout the Complaint. By failing to

disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

306.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

307.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

308.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

309.   Subaru knew or should have known that its conduct violated the NJCFA.

310.   Defendants were under a duty to New Jersey Plaintiffs and the New Jersey Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c)  Defendants actively concealed the defective nature of the Class Vehicles from New Jersey Plaintiffs and the New Jersey Sub-Class Members at the time of sale and thereafter.

311.  By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

312.  The facts concealed or not disclosed by Defendants to New Jersey Plaintiffs and the New Jersey Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had New Jersey Plaintiffs and the New Jersey Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

313.  New Jersey Plaintiffs and the New Jersey Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

314.   As a result of Defendants' misconduct, New Jersey Plaintiffs and the New Jersey Sub-Class Members have been harmed and have suffered actual damages and/or injury in fact in that the Class Vehicles are defective and require repairs or replacement.

315.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, New Jersey Plaintiffs and the New Jersey Sub-Class Members have suffered and will continue to suffer actual damages.

316.   New Jersey Plaintiffs and the New Jersey Sub-Class Members seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the CCPA, as well as an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under N.J. Stat. § 56:8-19.

**COUNT X**
**Violation of New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York Sub-Class)**

317.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

318.   Plaintiff Alice Reh ("New York Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the New York Sub-Class.

319.   Subaru, New York Plaintiff, and the New York Sub-Class Members are "persons" within the context of N.Y. Gen. Bus. Law § 349(h).

320.    Subaru engaged in "trade" or "commerce" within the context of N.Y. Gen. Bus. Law § 349(h).

321.    N.Y. Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

322.    Subaru violated N.Y. Gen. Bus. Law § 349 by: (i) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (ii) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (iii) advertising the Class Vehicles with the intent not to sell them as advertised; and (iv) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchased or lease the Class Vehicles.

323.    By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

324.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of the Class Vehicles.

325.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

326.   Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

327.   Subaru knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 349.

328.   Defendants were under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c) Defendants actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

329.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

330.    The facts concealed or not disclosed by Defendants to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

331.    New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

332.    As a result of Defendants' misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages and/or injury in fact in that the Class Vehicles are defective and require repairs or replacement.

333.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer asscertainable loss and actual damages as a direct and proximate result of Defendants' conduct.

334.    The conduct of Defendants offends public policy as established by statutes and common law, is immoral, unethical, oppressive and/or unscrupulous and

caused unavoidable and substantial injury to Class Vehicles owners and lessees, who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.  Defendants' violations of N.Y. Gen. Bus. § 349 present a continuing risk to New York Plaintiff, members of the New York Sub-Class, and to the general public. Defendants' deceptive acts and practices affect the public interest.

335.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, New York Plaintiff and members of the New York Sub-Class have been damages in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under N.Y. Gen. Bus. §349.

## COUNT XI
### Violation of the North Carolina Unfair and Deceptive Acts and Practices Act (73 P.S. §§ 201-1, *et seq.*)
### (On Behalf of the North Carolina Sub-Class)

336.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

337.   Plaintiff Kathleen Sears ("North Carolina Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the North Carolina Sub-Class.

338.   Defendants engaged in "commerce"  within the meaning of the North

Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. GEN. STAT. § 75-1.1(b).

339.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). Defendants willfully committed unfair or deceptive acts or practices in violation of North Carolina UDTPA.

340.   Subaru participated in deceptive trade practices that violated the Connecticut UDTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

341.  Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

342.    Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

343.    Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

344.    Subaru knew or should have known that its conduct violated the North Carolina UDTPA

345.    Defendants were under a duty to North Carolina Plaintiff and the North Carolina Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c) Defendants actively concealed the defective nature of the Class Vehicles from North Carolina Plaintiff and the North Carolina Sub-Class Members at the time of sale and thereafter.

346.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

347.    The facts concealed or not disclosed by Defendants to North Carolina Plaintiff and the North Carolina Sub-Class Members are material because a

reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had North Carolina Plaintiff and the North Carolina Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

348.   North Carolina Plaintiff and the North Carolina Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

349.   As a result of Defendants' misconduct, North Carolina Plaintiff and the North Carolina Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

350.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, North Carolina Plaintiff and the North Carolina Sub-Class Members have suffered and will continue to suffer actual damages.

351.   North Carolina Plaintiffs and the North Carolina Sub-Class Members seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the North Carolina UDTPA, as well as an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other

just and proper relief available under the North Carolina UTPA, N.C. GEN. STAT. § 75-16.

## COUNT XII
### Violation of the Ohio Consumer Sales Practices Act
### OHIO REV. CODE ANN. § 1345.01 *et seq.*
### (On Behalf of the Ohio Sub-Class)

352.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

353.   Plaintiff David Dian ("Ohio Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Ohio Sub-Class.

354.   Ohio Plaintiff, and the Ohio Sub-Class Members are are "consumers" as defined by the Ohio Consumer Sales Practices Act ("Ohio CSPA"). *See* OHIO REV. CODE ANN. § 1345.01.

355.   Subaru is a "supplier" as defined by the Ohio CSPA.

356.   Ohio Plaintiff's and the Ohio Sub-Class Members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

357.   The Ohio CSPA, OHIO REV. CODE ANN. § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." OHIO REV. CODE ANN. § 1345.02. Defendants' conduct as alleged above and below

constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of OHIO REV. CODE ANN. § 1345.02. By concealing the known defects in the Class Vehicles, Defendants participated in unconscionable acts and practices that violated the Ohio CSPA.

358.   Subaru participated in misleading, false, or deceptive acts that violated the Ohio CSPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

359.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

360.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Defendants's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

361.    Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

362.    Subaru knew or should have known that its conduct violated the Ohio CSPA.

363.    Subaru's actions as set forth above occurred in the conduct of trade or commerce.

364.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Subaru detailed in this complaint, including, but not limited to, the failure to honor implied warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA.    These cases including, but not limited to, the following: *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); *State ex rel. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); *Bellinger v. Hewlett-Packard Co.*, 2002 WL 533403 (Ohio. Ct. App. Apr. 10, 2002) (OPIF #10002077); *Borror v. MarineMax of Ohio*, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); *State ex rel. Petro v. Craftmatic Organization, Inc.* (OPIF #10002347); *Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586); *State ex rel. Brown v. Lyons, et al.* (OPIF #10000304); *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427); *Khouri v. Lewis* (OPIF #10001995); *Mosley v. Performance Mitsubishi aka Automanage, Inc.* (OPIF

#10001326); *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524); and *Brown v. Spears* (OPIF #10000403).

365.    Ohio Plaintiff and the Ohio Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

366.    Had Ohio Plaintiff and the Ohio Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

367.    Defendants were under a duty to Ohio Plaintiff and the Ohio Sub-Class Members to disclose the defective nature of the Class Vehicles because:

  a)  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

  b)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

  c)  Defendants actively concealed the defective nature of the Class Vehicles from Ohio Plaintiff and the Ohio Sub-Class Members at the time of sale and thereafter.

368.    By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

369.    The facts concealed or not disclosed by Defendants to Ohio Plaintiff and the Ohio Sub-Class Members are material because a reasonable person would

have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Ohio Plaintiff and the Ohio Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

370. Ohio Plaintiff and the Ohio Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

371. As a result of Defendants' misconduct, Ohio Plaintiff and the Ohio Sub-Class Members have been harmed and have suffered actual damages and/or injury in fact in that the Class Vehicles are defective and require repairs or replacement.

372. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Ohio Plaintiff and the Ohio Sub-Class Members suffered and will continue to sufferascertainable loss.

373. Defendants' violations present a continuing risk to Ohio Plaintiff and the Ohio Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

374. Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining Defendants' deceptive and unfair

conduct, court costs and attorneys' fees as a result of Defendants' violations of the Ohio CSPA as provided in OHIO REV. CODE ANN. § 1345.09.

## COUNT XIII
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 P.S. §§ 201-1, *et seq.*
### (On Behalf of the Pennsylvania Sub-Class)

375.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

376.    Plaintiff Sushma Narula ("Pennsylvania Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Pennsylvania Sub-Class.

377.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

378.    All of the acts complained of herein were perpetrated by Subaru in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

379.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

380.    As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

381.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

382.    Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

383.    Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

384.    Subaru knew or should have known that its conduct violated the Pennsylvania CPL.

385.   Defendants were under a duty to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c) Defendants actively concealed the defective nature of the Class Vehicles from Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members at the time of sale and thereafter.

386.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

387.   The facts concealed or not disclosed by Defendants to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

388.    Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

389.    As a result of Defendants' misconduct, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

390.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have suffered and will continue to suffer actual damages.

391.    Subaru is liable to Plaintiff and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a). Plaintiff and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Subaru's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XIV
### Violation of the Virginia Consumer Protection Act
### Va. Code Ann. §§ 59.1-196, *et seq.*
### (On Behalf of the Virginia Sub-Class)

392.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

393.    Plaintiff Katherine Spagnolo ("Virginia Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Virginia Sub-Class.

394.   Subaru, Virginia Plaintiff, and the Virginia Sub-Class Members are "persons" as defined by the Virginia Consumer Protection Act ("Virginia CPA"). *See* VA. CODE ANN. § 59.1-198.

395.   The sale or lease of the Class Vehicles by Virginia Plaintiff and members of the Virginia Sub-Class were for personal, family or household purposes and are "consumer transaction[s]" as defined by VA. CODE ANN. § 59.1-198.  .

396.   The Class Vehicles are "goods" as defined by VA. CODE ANN. § 59.1-198.

397.   Subaru is a "supplier" as defined by VA. CODE ANN. § 59.1-198.

398.   The Virginia CPA makes unlawful "fraudulent acts or practices." VA. CODE ANN. § 59.1-200(A).

399.   Subaru violated VA. CODE ANN. § 59.1-200(A) by, *inter alia*: (1) "[m]isrepresenting that the Class Vehicles have certain quantities, characteristics, ingredients, uses, or benefits;" (2) "[m]isrepresenting that the goods or services are of a particular standard, quality, grade, style, or model;" (3) "[a]dvertising goods or services with the intent not to sell them as advertised;" and (4) "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

400.   By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale

or lease of the Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

401. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

402. Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

403. Subaru knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

404. Subaru knew or should have known that its conduct violated the Virginia CPA.

405. Defendants were under a duty to Virginia Plaintiff and the Virginia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c)  Defendants actively concealed the defective nature of the Class Vehicles from Virginia Plaintiff and the Virginia Sub-Class Members at the time of sale and thereafter.

406.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

407.   The facts concealed or not disclosed by Defendants to Virginia Plaintiff and the Virginia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Virginia Plaintiff and the Virginia Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

408.   Virginia Plaintiff and the Virginia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Sudden Acceleration Defect. That is the reasonable and objective consumer expectation for vehicles.

409.   Defendants' unlawful acts and practices affect the public interest, and trade and commerce in the Commonwealth of Virginia, and present a continuing safety hazard to Virginia Plaintiff and members of the Virginia Sub-Class.

410.   As a direct and proximate result of Defendants' conduct and violations of the Virginia CPA, Virginia Plaintiff and members of the Virginia Sub-Class have

suffered actual damages and/or injury in fact, including, inter alia: (1) out-of-pocket monies for diagnosis and repair of the Class Vehicles, including replacement of parts, due to the Defect; (2) deprivation of the benefit of the bargain at the time of purchase or lease, including the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the Defect; and/or (3) the diminished resale value of the Class Vehicles containing the Defect.

411.    Virginia Plaintiff and members of the Virginia Sub-Class seek actual damages against Defendants in an amount to be determined at trial and/or statutory damages pursuant to the Virginia CPA based on Defendants' wanton and willful conduct, costs, attorneys' fees, restitution, disgorgement of funds, and any other just and proper relief available under the Virginia CPA.

## COUNT XV
### Fraud by Omission or Fraudulent Concealment
### (On behalf of the Class, or in the Alternative,
### on Behalf of the State Sub-Classes)

412.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

413.    Plaintiffs bring this cause of action on behalf of themselves and the nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes.

414.    Subaru knew that the Class Vehicles suffered from an inherent Sudden Acceleration Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

415.   Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

416.   Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

a)  Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b)  The omitted facts were material because they directly impact the safety of the Class Vehicles;

c)  Defendants knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

d)  Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e)  Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

417.   The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Whether or not a vehicle accelerates only at the driver's command, and whether a vehicle will stop or not upon application of the brake by the driver, are material safety concerns. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

418.   Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles in order to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendants' defective Class Vehicles.

419.   Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

420.   As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Defective Vehicles and obtain restitution (b) affirm their purchase or lease of the Defective Vehicles and recover damages.

421.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XVI
### Unjust Enrichment
### (On Behalf of the Class, or, in the Alternative, on Behalf of all Sub-Classes)

422.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

423.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes.

424.   Plaintiffs bring this count on behalf of themselves and all of the state Sub-Classes.

425.   Subaru has received and retained a benefit from Plaintiffs and the Sub-Classes and inequity has resulted.

426.   Subaru has benefitted from selling and leasing defective cars whose value was artificially inflated by Subaru's concealment of the Sudden Acceleration Defect, and Plaintiffs and the Sub-Classes have overpaid for the cars and have been forced to pay other costs.

427.   As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Subaru charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to Subaru's authorized distributors and dealers, which are in Subaru's control. Subaru also reaps huge profits from the sale of its vehicles through its authorized distributors and dealers, accounting for 66% of its global automobile sales, which netted $27,154,995 in sales for the fiscal year ended March 31, 2019.

428.   All Sub-Class members conferred a benefit on Subaru.

429.   It is inequitable for Subaru to retain these benefits.

430.   Plaintiffs and the Sub-Classes were not aware of the true facts about the Class Vehicles, and did not benefit from Subaru's conduct.

431.   Subaru knowingly accepted the benefits of its unjust conduct.

432.   As a result of Subaru's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

433.   Plaintiffs, individually and on behalf of all the members of the Sub-Classes, seek all relief permitted in accord with the proofs at trial.

<u>**COUNT XVII**</u>
**Violation of the Magnuson-Moss Warranty Act**
**(15 U.S.C. § 2301)**
**(On behalf of the Class, or alternatively, all Sub-Classes)**

434.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

435.   This claim is brought on behalf of Plaintiffs and the Class, or alternatively, on behalf of all Sub-Classes.

436.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

437.   Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

438.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

439.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

440.   Defendants' implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

105

441.  Defendants' express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

442.  Defendants breached the implied warranty and the express warranty by virtue of the above-described acts.

443.  Plaintiffs and the other Class Members notified Defendants of the breach within a reasonable time and/or were not required to do so. Subaru was also on notice of the Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

444.  Defendants' breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

445.  Plaintiffs and the Class Members have had sufficient direct dealings with either Subaru or its agents (dealerships and technical support) to establish privity of contract between Subaru, on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically, of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

446.  Subaru breached these warranties, as described in more detail above. Without limitation, the Class Vehicles contain a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are

manufactured with defective materials and/or with poor workmanship. Contrary to Subaru's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect that causes sudden unintended acceleration, often when the driver is trying to achieve the opposite effect by braking. This sudden acceleration failures are occurring within the warranty terms and period.

447.    Affording Subaru a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Subaru has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

448.    At the time of sale or lease of each Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

449.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Subaru is refusing to acknowledge any revocation of

acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

450.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

451.   Plaintiffs, individually and on behalf of all members of the Classes, seek all damages permitted by law, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs, the Class and all Sub-Classes, and award the following relief:

A. A declaration that Subaru is financially responsible for notifying all Class Members of the Sudden Acceleration Defect;

B. An order enjoining Subaru from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Subaru to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Subaru to repair and eliminate the Sudden Acceleration Defect from every Class Vehicle; enjoining Subaru from selling the Class Vehicles with the misleading information; and/or compelling Subaru to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

C. Damages and restitution in an amount to be proven at trial;

D. An order certifying the proposed Class and Sub-Classes, designating Plaintiffs named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

E. A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

F. Any and all remedies provided pursuant to the express and implied warranty laws, common law fraud by concealment laws, and consumer protection statutes alleged herein;

G. An award to Plaintiffs and the Class and Sub-Classes of compensatory, exemplary, and statutory damages as applicable, including interest, in an amount to be proven at trial;

H. A declaration that Defendants must disgorge, for the benefit of the Class and Sub-Classes, all or part of the ill-gotten profits it received from the sale or lease of Class Vehicles, and/or make full restitution to Plaintiffs and Class Members;

I. An award of attorneys' fees and costs, as allowed by law;

J. An award of pre-judgment and post-judgment interest, as provided by law;

K. Leave to amend the Complaint to conform to the evidence produced at trial; and

L. Such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated: November 24, 2020                BERGER MONTAGUE PC


                                        /s/ Russell D. Paul
                                        Russell D. Paul (NJ 037411989)
                                        Amey J. Park (NJ 070422014)
                                        Abigail J. Gertner (NJ 019632003)
                                        BERGER MONTAGUE PC
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA 19103
                                        Tel.:   (215) 875-3000
                                        Fax:   (215) 875-4604
                                        rpaul@bm.net
                                        apark@bm.net
                                        agertner@bm.net

                                        Steven R. Weinmann (NJ 033111989)
                                        Tarek H. Zohdy (*pro hac vice*)
                                        Cody R. Padgett (*pro hac vice*)
                                        Trisha K. Monesi (*pro hac vice*)
                                        CAPSTONE LAW APC
                                        1875 Century Park East, Suite 1000
                                        Los Angeles, California 90067
                                        Tel.:   (310) 556-4811
                                        Fax:   (310) 943-0396
                                        Steven.Weinmann@capstonelawyers.com
                                        Tarek.Zohdy@capstonelawyers.com
                                        Cody.Padgett@capstonelawyers.com
                                        Trisha.Monesi@capstonelawyers.com

                                        Greg F. Coleman (*pro hac vice*)
                                        Lisa A. White (*pro hac vice*)
                                        Jonathan B. Cohen (*pro hac vice*)
                                        GREG COLEMAN LAW
                                        800 S. Gay Street, Suite 1100
                                        Knoxville, TN 37929

Tel.:  865-247-0080
Fax:  856-522-0049
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
jonathan@gregcolemanlaw.com

***Interim Co-Lead Counsel for Plaintiffs and the Proposed Classes***